Our first case today is 2015-1361, Broadband v. Corning Optical. Mr. Jase, please proceed. Good morning, and may it please the Court. The Board made a fundamental mistake in this appeal when it construed the term continuity member in a way that doesn't require a continuous electrical connection. The Board's construction allows for intermittent or momentary contact, and it even ignored the fact that some of the claims recite maintaining electrical continuity. In the red brief, Corning says that, I'm going to quote for you, it's at page 28, PPC's arguments concerning claim construction and alleged missing limitations addresses only the first press-fit embodiment of the combination of prior art. PPC does not contest that the second sandwiching embodiment achieves both a continuity member and shape-configured to fit limitations even under PPC's proposed constructions. This Court can affirm the Board on this basis alone without any need to address the proposed construction and alleged missing claim limitations raised by PPC on appeal. And I didn't find in your briefs where you present your arguments regarding the second embodiment. Well, the reason that second embodiment, well, first of all, I disagree that it's an embodiment, so I'm going to use different terminology. It's the expert's conception that he drew in a sketch. There were never any findings or any evidence presented that that configuration, even if it could be made, that there would be continuous electrical contact between the nut and the post. That came up in connection with the other limitation, the shape-to-fit and configure-to-fit limitation, to show how it could be fit between two parallel surfaces. So there are no findings by the Board, first of all, that it would have been obvious to inject this spring from another piece of prior art in that location. And second, that it would make continuous electrical contact. We've never really had a chance to respond to that fact because there are no findings, and that was not Corning's argument below. Their argument below was that the spring, when it's placed around the post, would make contact with the post on the edge. And so it evolved into a different argument when they were talking about the shape-to-fit part of the element. So there are no findings, and we don't concede that this particular configuration, even if it could be made, would make continuous electrical contact between the post and the nut. I'm not going to dispute that it wouldn't make contact with the nut if you jammed it in there, but there's a lot more to it than that. The spring tines would have to contact the nut. There are no findings there, and this Court really can't do the job of the Board for it by making those findings. So the claim construction still does make a difference. So where, though, in the written description do you think is your best citation or your best point to support the conclusion that continuity requires constancy? That's essentially as I interpret your argument. That's right, that's right. There are a number of places in the specification where it says the continuity member maintains an electrical ground path. It makes consistent and physical contact with the nut, ensuring continuity of the ground path. It makes consistent physical and electrical contact with the post. Those are the descriptions of the continuity member. The word continuity... Cite to me where. Sure. Relevant to this, my question when you're discussing these citations is to think about and explain to us why it means a temporal continuity as opposed to a spatial continuity. Right. I can start with column 14 as perhaps one of the best. Column 14 at line 23, it talks about the continuity member. It maintains an electrical ground path. The ground path extends through, and then it goes on to say this continuous grounding path. Those are all related to the word continuity. I'm wondering if those are what I mentioned about the structural path as opposed to the temporal path. There are a couple of indications that it's not a structural path. First of all, it's between the nut and the post. That's just one path. When Corning talks about a continuous path, they're talking about from one length of the other. This particular continuity member makes a connection between the nut and the post. Second, even some of the claims give you an indication because they use the word when. They say that it maintains an electrical ground path when certain conditions are met. That's also an indication that we're talking about temporal. More importantly, the actual purpose of the invention is to avoid intermittent ground paths. It's not to have one path that runs the length of the other. Every connector does that. The ground path has to run through the connector. That's nothing that this invention was trying to accomplish. It has to be present at all times so that you don't have intermittent. Judge O'Malley, I'd also point you to column 15 and line 8 where it talks about retaining a constant physical and electrical contact, ensuring continuity of the ground path. Column 16, also at line 6, says the continuity member should maintain electrical contact. Further down in line 11, it talks about a continuous electrical shield. The bottom of column 18 also talks about consistent physical and electrical contact at line 57, 58, talking about electrical continuity. Would this be, though, a case, Mr. Jakes, where that nasty DRI standard used in these IPR-type proceedings makes, unfortunately for your client, a big difference, meaning I feel as though your case would be a heck of a lot stronger, and I'm sure you would agree, if you were arguing under Phillips. Wouldn't you agree that your case would be stronger? You can tell me you think it's going to come out the same way, but let's just skip over that and get to my point. I'd agree it would be stronger, but again, it comes down to what's reasonable here, and the word continuity is in the claims, and it's very carefully described in the specification. The board tried to, I think, without doing it as eloquently, the board tried to say that certainly at a minimum means structural continuity, the bridge between the nut and the post, but they thought the broadest reasonable construction didn't require continuity in time and would conceivably allow for the intermittence that you say the purpose of the invention was, again. That's right. And that is certainly a broad construction. The problem I'm struggling with, and I'm struggling with it in lots and lots of cases, is is it ever reasonable for them to adopt a non-Phillips construction? So this is where I'm struggling. I'm struggling because I think this case might be a poster child for the difference between BRI and Phillips and the impact it could possibly have on outcome. I can see in some of the court's decisions that those two things seem to be converging, and often the broadest reasonable construction is the same as the Phillips construction. I don't think this is a case where they would be different, as you said, Your Honor. You think the Phillips construction and the BRI construction are exactly the same here? I think you would come out of the same place, yes, because of the word reasonable. And the board's construction I don't think is reasonable because it goes contrary to the very purpose of the invention. The purpose of the invention is to avoid these intermittent ground paths when the nut is loose. And if the construction of the continuity member, which is designed to solve that problem, is that it doesn't have to solve that problem, that doesn't really make much sense. Help me out. Where does it say, because I do know of one place where I think it hints at it, but where does it say that the continuity member is designed to solve the problem of intermittence? Your Honor, I think that's throughout the whole specification. Okay. Then just give me your one place. That's the purpose of the invention. Okay. Show me one place. Okay. I think it starts from the very background, if I can locate the right place. At the bottom of the column one, at the bottom of the background of the invention. That's certainly my favorite place. And it exists for an improved connector, having the structural element included for ensuring ground continuity. Ensuring doesn't mean intermittence. That means that it's there. In fact, it goes further. Read above that a little bit where it says that your purpose is to avoid permitting loss of ground and discontinuity. That's exactly right. I do think that's very, very helpful for you. I'm just not sure. And in a Phillips world, I think you're right. I just don't know if you're right in a BRI world because I'm really still struggling with broadest reasonable construction notions. Well, I think it comes down to you still have to look at the specification. You can't look at the word continuity and say what possible things could it mean. That's not broadest reasonable. Well, I was going to say could it reasonably mean that you need, whenever you need continuity, it's there. That is, when you need to be grounded, it will be grounded. But when you don't need to be grounded, it doesn't matter. I think that would be fine because if the connector is not connected to anything, whether or not there's grounding, I can't see that it makes any difference. But the point is when the nut is loose, it still wants to have a continuity path. In addition to that column, the other things you rely upon are the extent to which the word consistent is referenced in the specification? Consistent is not a word that talks about a path. It talks about in time. Consistent means it exists all the time when it needs to be, not that it extends from one end to the other. Certainly, at a minimum, some of the dependent claims have the maintaining language. They do. I don't see any dispute that that requires overtime. I don't either. I think that was a fundamental mistake of the board where the board actually said we can't read the limitation maintained into the claims. Is there something else in those dependent claims? Because, of course, you know that claim differentiation notion. Is there something else in those dependent claims which had the maintaining limitation that would otherwise separate it from the independent claims such that I wouldn't worry about ending up with two claims with identical claim scope if I read maintaining into the broader continuity member? I think if you look at those dependent claims, they usually have additional conditions. They say when the connector is in a particular state. And so those would add limitations where that adds the word maintain. So this wouldn't be a situation where you think I would, by interpreting continuity member in the broader independent claim, thereby subsume the dependent claim? Well, honestly, there's not any difference between continuity member and maintaining electrical connectivity. They both mean the same thing. And so the other limitations in the dependent claim would distinguish those claims. But we say that it has to maintain electrical contact. That's the point of the continuity member. So what are the other limitations in the dependent claim that would get over the concern about? Sure. For example, they add particular times at which. Why don't you look at claim eight? I'll help you along. Thank you. You're almost out of time. That's right. The continuity member is configured to maintain electrical contact when the nut is in both partially tightened position and fully tightened position. So it's adding those additional conditions as to when it's maintained. If I could just briefly. Would that ever suggest, though, that it's not maintained in other positions, arguably, for the independent claim purposes? No. I don't think that's the correct way to interpret it. I think it's saying that in these particular conditions you have to maintain. And it's really saying even in these conditions you have to maintain. The electrical conductivity. That would suggest for the independent claim that in those conditions you don't have to maintain. I don't think so. The continuity member has to maintain it throughout and at all times. And in those particular conditions, it has to maintain it as well. Given that you don't expressly claim continuous continuity or continuous connection. Okay. And you have just a variety of sprinkling of things in the written description that you think support it. Why would the board's construction be unreasonable? Well, I think there are two reasons. One is the word continuity does kind of, that it has to be continuous. So that word by itself, it's not just a label. It does say a continuity member. So it has to be continuous. And second, to construe the claims to allow these intermittents, I think, defeats the purpose of the invention. And that's why it's not reasonable. Could I briefly address the secondary considerations? Because I think they're particularly strong in this case. And the board really gave them quite short shrift. Well, I don't know that that's fair. The board discounted them. But the board did go into a lot of detail. It's one of the most detailed opinions I've seen to the extent of addressing objective. That's right. And the board did find there was actually copying. And I think on commercial success, though, the board really did not get it right. These connectors have been an overwhelming commercial success any way you look at them. And I think the board here discounted that commercial success, saying it could have been based on other possibilities. There's no evidence of those other possibilities. We aren't required to disprove every other factor that could possibly contribute to that commercial success. So even under a substantial evidence review, you think the answer is there is just no evidence? There is no contrary evidence. All there is is doubt saying, well, it could have been something else. Well, then, if that were the case, wouldn't we be boxing the patent office into a scenario not in IPRs per se, but where every time, because IPRs are the one exception to this rule, but you can see where I'm going, in every ex parte scenario, any time an applicant introduces commercial success, I mean, you know, the board can't go out and obtain evidence. You're right. They just can't do that. The examiners can't do that. So would we be boxing them into a situation where even reasonable doubt on their part wouldn't be enough to overcome evidence if you put something in the record? Well, I think it would put them in a more difficult position. I don't think a one size fits all rule works here. We are in an IPR situation, and it really was Corning had the opportunity to present those factors, and so I think you do have to look at it differently since we are in an adversary proceeding as opposed to an ex parte proceeding. The evidence here, it shows that these connectors took over the market to 80 to 90 percent, and even though it was replacing PPC's earlier connectors, that's pretty substantial, and at a price premium. What's the PPC market share on the earlier connectors? You know, that's not in the record. Not in the record. No. But any product that has an 80 to 90 percent market share is significant, especially since it's replacing the product. The only difference was the continuity number. Thank you. Thank you, Mr. Jakes. Mr. Walters, please proceed. Can you start where we left off? Because on this issue of commercial success, I do have to say that Mr. Jakes has a point. These are supposed to be adversarial proceedings, and the board didn't cite any contrary evidence, just seemed to be speculating about what alternative explanations for the success would be. How do you get around that? So first of all, with regard to commercial success, I think what you heard was there was no evidence in the record of what the market share was before the new products were brought into the market, and the evidence before the board shows that the new products were just a replacement for the old products. As the old product market share went down, the new product market share went up, and I don't think that the new products ever even achieved the same market share as the old product, but I'm not absolutely 100 percent sure. But you didn't put any evidence to that effect? The evidence is in the record before the Patent Office. It's the evidence that PPC presented before the Patent Office. Is it in our appendix? It is not in your appendix. What is your best recollection, though, of what that evidence actually shows? Because I thought that it would likely only show market share of the new product. I mean, what does it show with regard to other than just in general PPC pulled one product off the market, put a new one on, but you're suggesting to us that that evidence in your recollection goes further and suggests that they didn't even achieve the same market share of the new product they previously had. So that would be quite detailed evidence. Yes, there was quite detailed evidence on that. There was a chart that was presented by a Mr. Jackson, I believe it was, and the chart shows that the market share was declining for the old product as the new market share was increasing, and I don't recall that the new product ever exceeded the old product market share. PPC already had a large part of the market here, and the Patent Office was aware of this. I want to go back and address a couple of the issues about the very first argument that we made in the appellee's brief, and that is PPC has never and does not now have any argument establishing why the second embodiment, that the board found was an obvious combination of the art, there was motivation in the art to arrive at that second embodiment. They have not presented a single argument either before the Patent Office or before this court explaining why that embodiment doesn't meet all the claims, even under their construction. They didn't present it in their briefs before this court. They didn't present it in the argument before this court, and they certainly didn't present it before the Patent Office. Now, PPC's counsel indicated that's because they didn't have an opportunity to do so, but they addressed that embodiment before the Patent Office in their patent owner's response in each of these four IPRs. Can you tell me where? It was about page 25 in the patent owner response. They also were aware of this well before they found- What's the JA? Pardon? What is the JA number? I don't believe that is in the appendix, but it is part of the record before the Patent Office. Can you tell me where in the Patent Office's decision you think they really clearly made these findings with regard to that second embodiment, the findings that you're talking about now? Sure. I'm looking at the decision in the 060 patent. Can you give me a JA site so I can make sure I line up with you? Bear with me a second. If you look at the appendix pages 33 and 34- Which appendix are we in? Are we talking about the next case? No, no. Next appeal? No, no, in the combined appeal. Page 33. 33 and 34. Where are the board's findings that you're referring to? You think the board already made findings that even under PPC's construction, this embodiment satisfies, because that goes to the maintaining continuity in a temporal sense. No, no, no. That's what I thought you said. Did you not say that? Let me clarify. Good idea. The patent office found that there was motivation in the art to put the Tatsuzuki continuity member into the Matthews device in the manner described as the sandwiching embodiment. That was the finding that the patent office made. They then went on and said, We are satisfied that one of ordinary skill in the art would have appreciated that Tatsuzuki's disshaped spring may be arranged in the Matthews connector so as to form a continuity member positioned in a manner required by claim one. But they construed the continuity member as not requiring the maintenance of continuity over time. So we don't know from a fact-finding standpoint if that limitation were part of the construction, would they have reached the same conclusion? So that's where PPC has waived its argument. It never argued before the patent office. It never argued before you in any of its briefing or explained to you in any of its briefing why that particular embodiment does not meet all of the limitations of the claim according to their construction. In fact, there's admissions in the record that that particular embodiment, which they will agree meets the configured to fit aspect, which is part of this case. They say through their expert, Dr. Eldering, and this is at page 1833 of the appendix in paragraph 76 of Dr. Eldering's declaration. They're talking about this embodiment, which they agree is the configured to fit or pressed to fit. Here's my problem, Miss. The board said that it found that there would have been, one of skill in the art would have been able to put this together or figured out how to put this together. But it says in the manner contemplated by independent claim one. If we conclude that the claim construction was wrong, then that in the manner finding is gone, right? In terms of what the board said in its decision, it had a construction. I absolutely agree with you. But PPC has never disputed when presented with the argument that even that construction would meet all of the limitations of their claims. I would ask them, what's different? What's different? You certainly can make that decision because there is a fact finding that that embodiment, that there was motivation to make that embodiment. You won't even need the board to do it. You say they made a finding, there's motivation to make that embodiment. Would your argument be that the only argument they raised with regard to this was that Tutte Suzuki teaches away from the second embodiment? Motivation and teaching away. That's the only argument they made. The patent office considered that and rejected it. There's substantial evidence in the record. It's Dr. Murakowski's deposition test. But you would concede that if we concluded that there had to be a continuous connection, in other words, one over time and not just all the way through, that that finding would not stand, right? Not at all. I'm not sure I'm understanding your question. Let me see if I can help you because this is truly in that vein. Your response, which you're not making but I think would be that even if that error occurred, it's harmless error because they haven't showed why it matters. Absolutely. Okay. Absolutely. That's your argument, right? Yes, yes. Okay. But I'd still like an answer to Judge O'Malley's question about, and really sort of a response to the question I asked your opposing counsel. It seems to me that what you're saying is that the grounding has to be there when it's needed, which is not every second of time. Very good question. I will try and answer the question, but I want to develop through where this issue came up from. On page 23 of appellant's brief, just like before the board, the appellant has argued that the terms continuity member and electrical continuity member require that the continuity member provide consistent contact and that it occur at all times. And the board rejected that argument for good reason. Number one, those terms are not found in the claims. As you heard earlier, those terms are- They're found in the dependent claims. Maintaining electrical continuity is in claim eight, for example, right? Yes. I'm right, right? You are correct. You are correct. But the term consistent contact- Well, I don't see how that could differ from maintaining electrical contact. I don't see- You can't maintain something inconsistently. Can you? Yes, you can. For example, think of a chain. You have a chain and you have- It's continuous. But not all of the links of the chain are as strong as maybe some other links of the chain. And so you think that we should construe maintaining electrical contact as permitting discontinuity completely contrary to the purpose of the invention as stated in the specification? I'm saying that you can maintain continuity for a period of time or under a condition without it being maintained at all times or with some particular quality aspect or robustness aspect. Or you may have an interest in simply keeping the nut from coming off entirely. That is, that the continuity is that the connection stays in place as opposed to not being in place. Correct. Think about the life of the continuity member after it's made. It's not even in the connector. That continuity member isn't maintaining continuity at that point, but it's still a continuity member. That's a crazy argument. You're saying that if we take all the pieces of a bicycle apart, they're no longer a bicycle. Well, what the heck does that prove? It's when it's put together as claimed. I mean, we don't look at individual elements. We look at claimed combinations. Let's continue to walk through the life cycle. You put it into the connector, but it doesn't have any connection to an interface port. It's certainly not providing continuity then. But it says, so as to maintain electrical continuity between the coupler and the post, and then it lists basically every three circumstances in which you could have it partially tightened or even when the post moves. And it has claims that also say that you don't get that continuity until you have at least several threads that occur. So, again, in the life cycle of this connector, start to put it onto the interface port. When you touch the interface port, you might not have continuity. When you're threaded by one thread, you might not have continuity. When you're turning it, you might not have continuity. That's like saying a picture is not hung perfectly on the wall until you put two nails in it rather than one because it's going to hang tilted. Until it's in operation connected to the components it's supposed to be used with, you wouldn't expect it to necessarily fully operate it. But when it is connected to the components in a full integrated circuit, you would expect it to work that way. But the claims don't provide any limitations. It's like saying a transistor is not a transistor if it's not plugged into a power source. It's like saying a transistor is not a transistor if it's not plugged into a power source. That's your argument. I'm not arguing that at all. I'm saying a transistor is a transistor if it's not plugged into a power source. A continuity member is a continuity member even if at a particular point in time it's not providing a continuous electrical ground path. So the point in time is when it's not on? Is that what you're saying? No, no. Maybe we should step back. What's the purpose of a capacitor? Explain it to me. Of a capacitor? If I'm exceeding your electrical engineering, you can tell me. I would not want to. I'm a chemical engineer. I would not want to. Resistor. What's the purpose of a resistor? To provide resistance. Okay, to provide resistance. Is a resistor providing resistance when it's not sitting in a circuit? In a circuit, it's connected to nothing. Is it providing resistance? It's a little tiny piece in my hand. Is it providing resistance? No, and it's still a resistor. But yet you're still calling it a resistor, and the definition of a resistor, as claimed, would still be something that provides resistance. That's somewhat our point. A continuity member is a continuity member regardless of whether it's in the device or not. Did the board make any specific finding that in the sandwiched configuration that the continuity provided would be consistent? In other words, that there was never a point in time in which it would not consistently provide the electrical connection. So what the board said in its decision. You can answer that yes or no. Did they make that finding or not? Whether it was consistent contact? I think yes, because they dealt with, for example, the dependent claims. But they were assuming. The only point in the board's opinion that you pointed us to with respect to the sandwich configuration is where the board said it was talking about its own interpretation of what was claimed by independent claim one, right? Which doesn't need consistency. So they never made a finding that the prior art, when put together, would have a consistent connection, right? So if you're equating consistent with maintained, my answer is the dependent claims they addressed. In fact, PPC never even separately argued the dependent claims that had the terms maintained in it. Certainly argument was made, and they found that those claims were obvious. So that was a finding. You keep telling us that even under the alternative claim construction that PPC is proposing, that that finding with respect to the sandwich configuration could stand. And my question is where did they make a finding under the alternative claim construction? I can't say that there's a specific portion of the decision where they explicitly said that under either construction, the sandwiching embodiment meets all of the elements of the claims. Again, we continue to fall back on, you certainly can make that decision because there is no harm if you do that here. There were sufficient evidentiary findings to allow you to make that decision. Okay, thank you, Mr. Walters. Mr. Jakes, we'll give you about two minutes of rebuttal. Mr. Jakes, was it a conscious decision on your part to only address the press fit embodiment and not address the sandwich embodiment? No, Your Honor, but there are no findings about this supposed configuration of sandwiching providing that continuous electrical contact. Why didn't you mention that in your brief? I believe we did. That's why we challenged the claim construction because there's nothing that shows that these supposed configurations meet that limitation. I think if you look at the Board's opinion where it discusses our argument about requiring maintaining electrical contact, the Board said it recognized the debate about whether or not this configuration would do that. That's the other configuration that said we don't really have to decide that because it's not in the claim. Where did they say that? That's at, I believe, 826. 826? Right, and there's nothing... That does make a difference, right? If they're expressly indicating they're not going to decide something, then we shouldn't interpret their findings as having decided it. There's nothing about sandwiching. I don't see it in 826, so why don't you find it for us? We'll give you a minute to talk afterwards. Well, on 826 there's a... and it comes from 825, there's a discussion of whether or not this particular sketch would meet the continuous electrical contact that we've said. And the Board says, we're satisfied it makes contact in the manner required by Independent Claim 1. Hold on, I haven't found it yet. Where are you, page 25? On 826 at the bottom where the Board says we're satisfied that it makes contact in the manner required by Independent Claim 1. It never resolves the question of whether it's continuous electrical contact as we've argued. It just says, in the manner we've said as to Claim 1. That's not the same thing as saying we are not going to reach a finding. No, no, no, Your Honor. I'm saying... You overstated it. They did not reach that finding. They said we... they did not resolve that evidentiary dispute. Yeah, but you said that they said they weren't resolving the evidentiary dispute. They don't say that. They don't say that explicitly. You're right, Your Honor. By deciding the claim construction, they effectively avoided that issue. Okay, do you have a final thought or anything? I just want to point out that the maintain word is also in some of the independent claims. It's in Independent Claim 1 of the 060 patent, Independent Claim 7 of the 353 patent. I have the list. Yes. Okay. All right, thank you, Mr. Jakes. Thank you, Mr. Walters. This case is taken under submission.